TJS:MKP
F.# 2014R00365

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



---

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID 100010540927689
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC

---

**APPLICATION FOR A
SEARCH WARRANT FOR
INFORMATION IN
POSSESSION OF A PROVIDER
(FACEBOOK ACCOUNT)**

Case No. _____

---

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Steven Mullen, first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook user ID that is stored at premises owned,

maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking

company headquartered in Menlo Park, California.  The information to be searched is described

in the following paragraphs and in Attachment A.  This affidavit is made in support of an

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to

require Facebook to disclose to the government records and other information in its possession,

pertaining to the subscriber or customer associated with the user ID.

2.     I have been a Special Agent with the Department of Homeland Security,

Homeland Security Investigations ("HSI") for approximately 10 years and am currently

assigned to Child Exploitation Investigations Unit.  During my tenure with HSI, I have

participated in numerous child exploitation investigations, during the course of which I have conducted physical and electronic surveillance, executed search warrants, reviewed and analyzed electronic devices, social media returns and interviewed witnesses.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1001 have been committed by JENNIE LEMAY. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.     On July 7, 2015, JENNIE LEMAY was arrested on a complaint, sworn in the Eastern District of New York charging her with conspiring, with Alberto Randazzo, to sexually exploit a child. Subsequently, on October 19, 2015, the grand jury returned a superseding indictment, charging her with the same. LEMAY met Randazzo over the Internet and used various Internet services including Yahoo! Messenger and Skype to commit the crime with which she is charged.

6.     On August 24, 2015, United States District Judge Pamela K. Chen ordered LEMAY released pending trial to home detention on a $300,000 bond secured by a $15,000 cash deposit, a property owned by LEMAY and a property owned by her sister. The Court stated that the substantial financial package and the fact that LEMAY was undergoing

2

treatment for pancreatic cancer were key factors in the Court's decision to release LEMAY. The bond included conditions barring LEMAY from having any contact with minors and from using the Internet except to communicate with Pretrial Services, defense counsel, a treatment provider or someone else approved by Pretrial Services.

7.     On August 3, 2016 a bond revocation hearing was held as to LEMAY after she violated her pretrial release conditions by attending a Broadway show and visiting Foxwoods Casino in Connecticut without the permission of Pretrial Services. The Court did not remand LEMAY, but stated that any future violation would result in her arrest and revocation of her bond.

8.     On May 19, 2017, the victim's social worker contacted me to alert me that LEMAY had created a new Facebook page under the pseudonym "Molly Mansion", which he had learned from Winter Sargent, who is LEMAY's estranged daughter. On May 20, 2017, I contacted Ms. Sargent who explained that on Mother's Day 2017 (Sunday, May 14, 2017), she received a "friend request" from the Molly Mansion Account, and she knew immediately it was LEMAY because "Molly" is the name of LEMAY's dog who died and "Mansion" is what LEMAY calls the large Victorian home in which she lives.

9.     I then reviewed publicly available pages of the Molly Mansion Account, which has a Facebook ID of 100010540927689, and observed photographs of LEMAY and LEMAY's sisters. I also observed that the Facebook page listed 14 "friends," several of whom I know from the investigation to be LEMAY's friends and relatives. These friends included all LEMAY's sisters, including Bessie Sargent and Patti Weatherford —both of whom signed LEMAY's bond; her close friend and former co-worker Bethanny Lauzon and

3

Ms. Lauzon's fifteen-year-old daughter, Edie; and a man named Mark Taylor, with whom LEMAY had a sexual relationship with from at least September 2013 through January 2014.

10. On May 23, 2017, Massachusetts Pretrial Services Officer Michael Forman conducted an unannounced home visit to LEMAY at the SUBJECT PREMISES. LEMAY admitted maintaining an Internet connection for her tenants, but denied having any Internet-capable devices, and said she does not access the Internet.

11. On June 1, 2017, I interviewed Ms. Lauzon in person. Ms. Lauzon confirmed that she has been Ms. Lemay's friend for 20 years. Ms. Lauzon confirmed that the Molly Mansion Account belongs to LEMAY and that she first received a friend request from the Molly Mansion Account in or around December 2016. Ms. Lauzon also explained to me that "Molly" is a reference to LEMAY's deceased dog and that "Mansion" is what LEMAY calls her home. Ms. Lauzon added that a picture of a tree on the Molly Mansion Account profile page is picture of a tree in Lemay's backyard. Ms. Lauzon confirmed that Edie Lauzon is her daughter and that she is a minor. I asked Ms. Lauzon about another of the friends on the Molly Mansion Account—Nicole Lafebvre. Ms. Lauzon explained that Ms. Lafebvre is a friend of Ms. Lauzon's who runs a direct-sale home business for LuLaRoe, selling women's clothing, and that LEMAY had purchased clothing from Ms. Lafebvre.

12. On June 5, 2017, Eastern District of New York Pretrial Services Officer Michael Ilaria spoke with LEMAY and she again denied accessing the Internet at all since her release. She also specifically claimed not to have accessed Facebook since her release and said she had "never even heard the name 'Molly Mansion.'"

4

13. On June 7, 2017, I interviewed Ms. Lefebvre by telephone. Ms. Lefebvre has known LEMAY casually for the past 10 years, through her own friendship with Ms. Lauzon. Ms. Lefebvre confirmed she owns a direct-sale business through LuLaRoe. Ms. Lefebvre explained that customers are invited to her Facebook group and she will conduct live events where she posts items of clothing that are available for sale and if someone wants a piece they will write "sold." Ms. Lefebvre confirmed that the Molly Mansion Account was used to make several purchases. Initially she did not know who "Molly Mansion" was but believes that Ms. Lauzon told her the Molly Mansion Account belonged to Jennie Lemay. Ms. Lefebvre provided several email receipts that she sent to LEMAY after LEMAY made purchases through the Molly Mansion Account. These receipts include LEMAY's full name and the address where LEMAY currently resides. Ms. Lefebvre also noted that she provided the items LEMAY purchased to Ms. Lauzon for Ms. Lauzon to deliver to LEMAY.

14. On June 7, 2017, I again interviewed Ms. Lauzon, this time by phone. Ms. Lauzon explained that when Ms. Lefebvre started her business a few months ago, Ms. Lefebvre asked her to refer Facebook friends who might be interested in the clothing to Ms. Lefebvre's Facebook group. Ms. Lauzon referred Jennie Lemay, under the Molly Mansion Account, to Ms. Lefebvre. Ms. Lauzon explained that Ms. Lefebvre provided her with three items of clothing—a dress, a t-shirt and a pair of leggings[1]—to deliver to LEMAY. Ms. Lauzon said she delivered the dress and t-shirt to LEMAY, at LEMAY's home, during the week of May 22, 2017. LEMAY told Ms. Lauzon she could keep the leggings, a picture of

---

[1] The three email receipts provided by Ms. Lefebvre correspond to these three items.

which is attached as Exhibit 6. Ms. Lauzon noted that she had tried to locate the Molly

Mansion Account over the past few days but that it appeared to have been taken down.

15.     On June 8, 2017, I verified that the Molly Mansion Account is no longer

accessible, indicating that it was deleted or deactivated at some point between May 30, 2017

and June 8, 2017.

16.     A preservation request for the Molly Mansion Account was done on May 30,

2017.

17.     Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com. Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

18.     Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter. This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password retrieval), physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal identifiers.

Facebook also assigns a user identification number to each account.

19.     Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network. Facebook assigns a group

identification number to each group. A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request"

accepts the request, then the two users will become "Friends" for purposes of Facebook and can

6

exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

20. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

21. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

22. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.

7

When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

23.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

24.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

25.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

26.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

27.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log

8

includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

28. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

29. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

30. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

31. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

32. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact

9

Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

33.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

34.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

35.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

10

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's

11

state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

37.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

39.     Based on the forgoing, I request that the Court issue the proposed search warrant.

40.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

41.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Steven Mullen
Special Agent
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn to before me on _____ June 27 _____, 201 7

S| Gold.
_____
HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the Facebook user ID

100010540927689 that is stored at premises owned, maintained, controlled, or operated by

Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody,

or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or

information that have been deleted but are still available to Facebook, or have been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the

following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user

identification number, birth date, gender, contact e-mail addresses, Facebook

passwords, Facebook security questions and answers, physical address (including

city, state, and zip code), telephone numbers, screen names, websites, and other

personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts

and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)   All "check ins" and other location information;

(g)   All IP logs, including all records of the IP addresses that logged into the account;

(h)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)   All information about the Facebook pages that the account is or was a "fan" of;

(j)   All past and present lists of friends created by the account;

(k)   All records of Facebook searches performed by the account;

(l)   All information about the user's access and use of Facebook Marketplace;

(m)   The types of service utilized by the user;

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations of Title 18, United States Code, Section 1001 since August 24,

2015, including, for each user ID identified on Attachment A, information pertaining to the

following matters:

>       (a) Jennie Lemay's use of Facebook since being released on home detention subject
>       to the bond condition that she not access the Internet and her deletion or
>       deactivation of the account associated with the user ID identified on Attachment
>       A in or around June 2017,
>
>       (b) Evidence indicating how and when the Facebook account was accessed or used,
>       to determine the chronological and geographic context of account access, use, and
>       events relating to the crime under investigatstion and to the Facebook account
>       owner;
>
>       (c) Evidence indicating the Facebook account owner's state of mind as it relates to
>       the crime under investigation including motive and intent to commit the crime or
>       consciousness of guilt;
>
>       (d) The identity of the person(s) who created or used the user ID, including records
>       that help reveal the whereabouts of such person(s).

3